McMILLEN *et al. v.* BOYLES, County Judge.

The act entitled "an act legalizing the issue of county, city, and town corporation bonds in the counties of Lee and Davis," (Stat. of 1857, 447), is not unconstitutional.

The power to subscribe to the capital stock of railroad corporations, and to issue county bonds in payment of such subscriptions, having been conferred upon the counties, any defect in the exercise of the power, may be cured by the General Assembly of the State.

*Appeal from the Lee District Court.*

TUESDAY, JUNE 22.

BILL FOR AN INJUNCTION, TO ENJOIN THE RESPONDENTS FROM THE COLLECTION OF CERTAIN RAILROAD TAX. At a former date, the people of the county of Lee, voted upon the question of a subscription to each of three railway companies, to assist in constructing three railways in that county. The proceedings submitting the matter to a vote, were brought to this court for review, and were held invalid, principally upon the ground that three distinct and independent measures, were submitted together, upon such terms that each was made to depend upon the others, and neither could take effect, notwithstanding a favorable vote, unless the others were also carried. (See 3 Iowa, 311.) At the session of the legislature, commencing in December, 1856, an enabling or curative act was passed, legalizing the proceedings and vote, and healing the defect therein, (Stat. 1857, 447), under which the county officers of Lee county, were proceeding to collect the taxes authorized by said vote. A demurrer to the bill was sustained, and the complainants appeal.

*F. Semple,* for the appellants, contended that the original proceedings, under which the subscription to the railroads was voted, and the act passed by the general assembly, curing the defects in the proceedings, were unconstitutional and void, citing 1 Black. Com., 44; *City of Bridgeport* v. *Housatonic Railroad Co.*, 2 Am. Railroad Cases, 39; *Merrill* v. *Sherburn*, 1 N. H., 199.

McMillen et al. v. Boyles, County Judge.

*J. M. Beck*\*, (with whom was *J. C. Hall*,) for thea ppellees.

The question as to the constitutional power of the counties of this State, to subscribe to the capital stock of railroads, has been definitely and finally settled by three decisions of this court. The case of the *Dubuque and Pacific Railroad Co.* v. *Dubuque County*, 4 G. Greene, 1, was decided by Judges Williams, Green and Kinney. *The State, ex rel. Leech* v. *Bissel*, 4 G. Greene, 328, was decided while Judge Hall was on the bench, and *Clapp* v. *Cedar County*, 5 Iowa, 15, by the present judges. It is decided in these cases, that by chap. 15 of the Code, sections 114, 115, 116, 117, 118, 119, the legislature, in discharge of its constitutional power, has authorized the counties to take stock in railroads, and issue their bonds in payment therefor. So many decisions of this court, concurred in by almost all the judges that have occupied the bench, undoubtedly has definitely and fully settled the questions involved.

The only point to be determined, in the case at bar, is conceived to be this: Is the law of the legislature, legalizing the bonds of Lee county, issued for railroad purposes, (Session Laws 1857, chap. 258, 447), valid and of force, and are its provisions sufficient to cure and remedy the defects in the proceedings of Lee county, in voting the subscription to said railroads, and issuing the bonds.

The legislature having the constitutional right to confer the power upon the counties to subscribe to railroads, and having conferred that power, in chapter 15 of the Code,

---

\* If any apology is necessary for publishing *in extenso*, the able argument of J. M. BECK, Esq., the reporter trusts it will be found in the importance of the questions under discussion—in the reference to the authorities cited by him, by the court—and in the brevity with which the views of the court are expressed in the opinion. The argument of Mr. SEMPLE is not published, for the reason, that it was evidently not prepared for publication, and cited but few authorities.     REPORTER.

McMillen et al. v. Boyles, County Judge.

such subscription and issuing of bonds in payment thereof, on the part of Lee county, can only be considered invalid, on account of irregularity and non-compliance with the law, directing in what manner the power may, or can be exercised. These bonds cannot be considered void, because of want of power in the county to issue them. That power, this court has decided she possesses. *Clapp* v. *Cedar County*. If the bonds, then, are invalid, it is because the county, or more properly, the officers thereof, have not complied with the provisions of the law, and have not followed the directions therein given, for the exercise of the duties, and the discharge of the powers conferred. In *McMillan et al.* v. *Lee County et al.*, 3 Iowa, 313, this court construed the law to direct, that in case a proposition to subscribe to several railroads was submitted to the vote of the people, the subscription to each road should be a distinct and separate proposition, and not dependent on the others; and in a like manner, the question of a tax to pay the subscription to each road, should be an independent and distinct question. The proceedings in Lee county, were not in accordance with this construction of the law. The different subscriptions and the tax, were voted upon as one proposition. Lee county, in attempting to exercise a power conferred upon her by the legislature, failed to follow strictly the directions prescribed for the exercise of that power. Without the consent of the legislature, the power could not have been lawfully exercised. That being given, if the restrictions and conditions imposed, had been complied with, the act of the county would have been valid and binding.

The legislature, possessing the constitutional right to confer this power on the counties, undoubtedly could fix whatever restrictions upon the exercise of it, wisdom would seem to dictate. It could permit the exercise of it by the proper officers of the counties, without the vote of the people. 3 Grattan, 247; 8 Leigh, 120; 24 Wend., 64; 5 Gilman, 405. It could permit or forbid joint propositions to be submitted to one vote; and the manner and form of

the exercise of the power is, evidently, governed only by legislative discretion and wisdom, and is entirely under the control of the law making power. If, then, the legislature could modify and change the manner and form of the proceedings before the vote, it could, most certainly, conform and ratify proceedings not strictly in accordance with the law governing them. To deny this, would strip the legislature of its plenary power of legislation. There are many cases in point, fully sustaining this position, a few of which only I will quote. *Cowgill et al.* v. *Long*, 15 Ill., 203. The statute of Illinois authorized the inhabitants of any school district, to vote a tax for the purpose of building school houses, "on any Saturday of May or June." On Saturday, the 20th of July, a tax was voted for that purpose. Plaintiffs were charged with an amount of tax, and their property distrained to pay the same. They thereupon, filed their bill in chancery to enjoin the selling of the property. While this suit was pending, the legislature passed a special act, legalizing the vote of the inhabitants of said school district, in levying said tax, and declaring the same "good, valid and effectual in law and equity." The court held, that under the law existing at the time of the vote, the tax was illegally levied, and invalid, but that the act of the legislature legalizing said vote, and curing the defects therein, was effectual for that purpose, and that the legislature, without any doubt, had authority to enact the law.

The courts have uniformly held that, in cases where the legislature has authority to prescribe the form and manner of particular proceedings, the departure from the direction of the law, may be confirmed by a subsequent act of the legislature, and be made valid and legal. Defects in the levy of an execution, may be cured by subsequent statute. *Beach* v. *Walker*, 6 Conn., 190 ; *Booth* v. *Booth*, 7 Conn., 350. So, a statute may confirm a judgment, and cure defects therein. *Underwood* v. *Lilly*, 10 Serg. & Rawle, 97. A sale of land made in good faith, by an executor, without authority of law, may be confirmed, and

the title thereto rendered valid, by especial legislative enactment. *Wilkinson* v. *Leland*, 2 Peters, 627. So, a statute may cure defects in a sheriff's deed. *Menges* v. *Wertman*, 1 Penna. State Reports, 218. A statute may cure defects in the form of acknowledgments of deeds. *Chestnut* v. *Shane*, 16 Ohio, 599 ; *Barnett* v. *Barnett*, 15 Serg. & Rawle, 72 ; *Tate* v. *Stoolzfoss*, 16 Ib., 35 ; *Watson* v. *Mercer*, 8 Peters, 88. In all of these cases, the legislature had prescribed rules of proceedings which were of general application. The law fixed the manner of a levy of an execution—the proceedings in causes prosecuted to judgment—the proceedings necessary to render valid executors's sale of lands—the form and requisites of sheriff's deeds, and the form and manner of acknowledgments of conveyances. The requirements of the law, in none of these cases, were complied with, but the courts held that it was competent for the legislature to render valid such proceedings, and cure such defects and irregularities, by subsequent legislation.

The case of *The City of Bridgeport* v. *Housatonic Railroad Company*, 15 Conn., 475, is in point. The plaintiff (City of Bridgeport,) subscribed to the stock of the Housatonic Railroad Company, without any authority for such subscription in her charter. Afterwards, the legislature " ratified, confirmed and established, and made obligatory" upon said city, said subscription ; provided, however, that the confirmatory law, or resolution, should not take effect until the same was submitted to, and approved by the freemen of the city. The court held, that the legislative ratification of the subscription, rendered it valid and binding. The fact, that the law required the express consent of the city, before it should take effect, cannot change the force of the decision, in its application to the case at bar. There was no more necessity for the submission of this law, in order to give it force, to the approval of the people, than for a like popular ratification of any other statute. The power conceded to legislate, with the express consent of the people given in that way, admits the power to legis-

late without it.  The force of the law was not obtained by this submission to the people; it flowed from the inherent power of the legislature.  The courts will always presume consent of those affected by legislative acts, if it is necessary to sustain them.  In *Wellington et al., petitioners,* 16 Pick., 95, Chief Justice Shaw, lays down this explicit rule: "If an act of the legislature appears on the face of it, to be an encroachment on the rights of any person, but would, nevertheless, be valid, if passed with the consent of those persons, the court is bound to presume such consent was given."

The consent of the people of Lee county, must be presumed by this court, to have been given to the ratification, by the legislature, of their acts in question.  The case at bar, then, differs as to the consent of those concerned, in no respect from the case last quoted, and in other respects, would seem to require, with greater force, the application of the doctrine contended for.  The city of Bridgeport voted and made the subscription, without authority of law; the county of Lee had full authority, under the law of the State, to subscribe to the stock of the railroads, and issue her bonds thereon, but in so doing failed to follow the directions of the statute.  Assuredly, the same principles of law that would authorize the legalizing of the proceedings of the city of Bridgeport, would apply with greater force to the law curing defects in, and making valid the solemn contracts of Lee county.

It is a well recognized principal of law, and it is of universal application, that in all cases where power must be conferred to render the performance of a particular act valid and binding, such act, done without authority, may be so ratified and confirmed, that it will have all the force and effect a prior conferred power would have given it.  To this rule there can be no exception.  The question may arise, from what source this ratification shall come— whether from the original possessor of the power, or the the party affected by the exercise of it, or from both.  In the case now before the court, there can be no difficulty on

that point, for the ratification 'necessary to the validity of the acts and proceedings claimed to be void, has been had from all sources: from the legislature, the source of the power, by the statute in question; from the people of the county, by their presumed consent—in accordance with the doctrine of Chief Justice Shaw, above quoted; and from the representatives and officials of the county, by their acquiescing in, and acting under it.

Upon these principles, sustained by the authorities above quoted, I conclude the confirmatory act of January 29, 1857, legalizing the bonds of Lee county, is a legitimate and proper exercise of legislative power, and by that act, the bonds are made valid and binding.

By the constitution of Iowa, (in force at the date of the statute in question), supreme legislative authority was conferred upon the general assembly, subject only to the restrictions and reservations contained in that instrument. It was not a grant of power, but a restriction thereon.  The legislature could, therefore, exercise all powers not forbidden by the constitution of the State, or delegated to the general government, or prohibited by the constitution of the United States.   These were the only limits upon the power of the legislature. 1 Kent Com., (marg. page), 448, 9; *Sawyer* v. *The City of Alton*, 3 Scam., 130; *People* v. *Toynbee*, 2 Parker, C. R. (N. Y.), 490; *Cochran* v. *Van Surly*, 20 Wend., 382.  The people, in their wisdom and power, established the constitution as the paramount and supreme law of the land.    In it, our free and republican institutions are perpetuated—our liberties are guarded with care, and all the individual rights of persons and property, consistent with the public welfare, are jealously preserved; but no other restrictions are placed upon the law-making power. All laws, therefore, that are not forbidden by the constitution of the State, or of the United States, are of force and effect, and are to be so recognized, and as such, enforced by the judiciary branch of the government. Their wisdom and justice is not to be inquired into; their policy and expediency is not a subject of inquiry by the

department of government called upon to interpret and enforce them. If found consistent with the plain provisions of the constitution, they are to be enforced, without applying any other test. *Hamilton* v. *St. Louis County Court*, 15 Mo., 4; *Sharpless* v. *Mayor of Philadelphia*, 21 Penn. State, 147.

In *Cochran* v. *Van Surly*, 20 Wend., 382; it is said: "It is difficult upon any general principles, to limit the omnipotence of the sovereign legislative power by judicial interpretation, except so far as the express words of a written constitution gives that authority. There are, indeed, many dicta, and some authorities, holding that acts contrary to the first principles of right, are void. The principle is unquestionably sound as the governing rule of a legislature in relation to its own acts, or even in relation to a preceding legislature. It also offers a safe rule of construction for courts, in the interpretation of laws admitting of doubtful construction, to presume the legislature could not have intended an unequal or unjust operation of its statutes. Such construction ought never to be given to legislative language, if it be susceptible of any other, more conformable to justice; but if the words be positive, and without ambiguity, I can find no authority for a court to vacate or repeal a statute on that ground. But it is only in express constitutional provisions, limiting legislative power, and controling the temporary will of a majority, by a permanent and paramount law, settled [by the deliberative wisdom of a nation, that I can find safe and solid ground for the authority of courts of justice to declare void any legislative enactment. Any assumption of authority beyond this, would be to place in the hands of the judiciary, power too great and too undefined, either for its own security or the protection of private rights." The legislature of Iowa, being possessed of supreme legislative authority, restricted only by the constitution of the State, and the United States, could pass all laws not inconsistent with either.

The only point, then, in this case, to be decided by this court, is this : Is the statute in question within the restrictions imposed upon the legislative power of the State?

Before noticing the constitutional objections to the statute, it will be well to consider the principles and rules that should govern the court, in exercising its power of annulling, by its decisions, the acts of the law-making department of the government.   That this court possesses the power, is not denied; and none other possessed by it is to be more cautiously and considerately exercised.   If exercised within the rules and principles prescribed and recognized by the numerous authorities in point, it is an ark of safety for the rights of the people. But if arbitrarily enforced—based upon the views or reasoning of the court on questions of policy, justice or right—it would have a tendency to subvert the very principles of our government.   The power of courts to interpret and construe laws, does not carry with it a power to annul them.   And it would be dangerous indeed, for courts in the exercise of their power of interpretation, to disregard the plain language of law, and by construction, to bring it within constitutional restrictions, thereby rendering it of effect.   It would be equally dangerous for courts, by the construction of the constitution, to make its restrictions applicable to laws not within the plain language of the instrument.

Chief Justice Marshall, in *Fletcher* v. *Peck*, 6 Cranch, 37, says : " The question whether a law be void for its repugnance to the constitution, is at all times a question of much delicacy, which ought seldom, if ever, be decided in the affirmative, in a doubtful case."   " It is not on slight implication, and vague conjecture, that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void.   The question between the constitution and the law should be such, that the judge feels a clear and strong conviction of their incompatibility with each other."   Justice Washington, in *Cooper* v. *Telfair*, 4 Dallas, 14, says: " The presumption, indeed,

must always be in favor of the validity of laws, unless the contrary is clearly demonstrated." The same eminent judge observes, in *Ogden* v. *Saunders*, 12 Wheaton, 270: " It is but a decent respect due to the wisdom, the integrity and the patriotism of a legislative body, by which any law is passed, to presume in favor of its validity, until its violation of the constitution is proved beyond all reasonable doubt. This has always been the language of this court, when that subject has called for its decision; and I know that it expresses the honest sentiment of each and ever member of this bench." Judge Blackford, in *The State* v. *Cooper*, 5 Blackford, 259, says: " In questions of this kind, (the constitutionality of a law), it is our duty to decide in favor of the validity of the statute, unless its constitutionality is so obvious as to admit of no doubt. Chief Justice Shaw, in *Wellington et al., petitioners*, 16 Pick., 95, after admitting that, in a proper case, the courts may declare an act unconstitutional and inoperative, uses the following language: " Perhaps, however, it may be well doubted, whether a formal act of the legislature, can ever, with strict legal propriety, be said to be void; it seems more consistent with the nature of the subject, and to the principles applicable to analogous cases, to treat it voidable." " If a legislative act may, or may not, be void, according to circumstances, courts are bound by the plainest principles of exposition, as well as by just deference to the legislature, to presume the existence of those circumstances which will support it and give it validity."

The uniform doctrine of the courts is, that a law will not be pronounced unconstitutional and void, unless it clearly and palpably conflicts with the constitution; and of this there must be no doubt in the mind of the judge. In the different decisions of the courts, this doctrine is announced in various words, but in all with equal force, conveying the same idea. In *Santo et al.* v. *The State of Iowa*, 2 Iowa, 208, it is held that the court will not pronounce a law unconstitutional, " unless the case be clear, decisive and unavoidable." See *Lane* v. *Drummond*, 3

Scam., 240; *People* v. *Foote*, 19 Johnson, 58. At least one hundred other cases of the same purport, could be cited. To authorize a court to pronounce a law void, in accordance with the doctrine of these authorities, it must conflict with express provisions of the constitution. It will not do to put a forced construction on, or draw an inference from, that instrument, and by that means condemn an act of the legislature.

I will proceed to notice the points made by the attorney for plaintiffs, to establish his position that the law in question is unconstitutional and void. He relies upon sections 1, 6, 9, 18, 21 and 24 of the Bill of Rights, and article 3, section 26 of the constitution, and strenuously contends that the law in controversy conflicts with them. Section 1 insures the right of acquiring, possessing and protecting property; and section 8 provides that, "private property shall not be taken for public use, without just compensation." It is gravely contended by the solicitor for plaintiffs, that the statute in question violates these constitutional guarantees.

I confess that I want the powers of imagination to enable me to see how, in the least degree, this statute interferes with, or abridges, the right of " acquiring, possessing and protecting property," or in any way subjects property to be taken for the public use. It authorizes no proceedings, and licenses no man to interfere with the lands or goods of another. The petitioners have the same rights of property, and the same security in the possession thereof, since the enactment of this law as before. Not one cent in value of their property can, by virtue of the law, be taken from them. But it is contended, the law will authorize the levying a tax to pay the bonds, and taxation is identical with the taking of property for public use, and with interfering with the right to " acquire, possess, and protect" it. If this be true, then, indeed, is the constitution constantly violated and disregarded. Every tax levied within the State, violates these provisions of the bill of rights. There can be no distinction in favor of any

tax. Those for ordinary State and county revenue, as well as those special taxes for building bridges, jails, poorhouses and railroads, must not again be levied, if this doctrine be correct; and hereafter we will present to the world the gratifying spectacle of a State existing without taxes and without a revenue.

Happy thought, but unfortunately for the tax-ridden people, that it is so lately conceived. This court, if the argument be sound, violated the constitution in *Clapp* v. *Cedar County*, by deciding, that under chapter 15 of the Code, the counties could subscribe to railroads, and levy taxes to pay such subscription. But, in the event of that decision being law, notwithstanding this recent constitutional discovery, I would respectfully inquire, what distinctions exist that makes it constitutional for the legislature, in chapter fifteen of the Code, to authorize taxes to be raised for building railroads, and renders the same thing unconstitutional in chapter 258 of the session laws of 1857?

The sixth section of the bill of rights, is relied upon as prohibiting the law in question. It provides, "that all laws of a general nature, shall have a uniform operation," and the solicitor for plaintiffs contends, that because the law is applicable to Davis and Lee counties only, it is obnoxious to this provision. In the first place, it is not a general law, for it is confined to Davis and Lee counties, and therefore local; in the second place, it is uniform in all its operations, for it cures defects in all votes, and legalizes all bonds of said counties, precisely in the same way. The gentleman complains that, by the operation of this law, the people of Lee county are taxed, while the people of Van Buren are exempt from such taxation. By virtue of law, the people of Lee county pay a tax for the purpose of building a poor-house. No such tax is paid in Van Buren. Is the law authorizing the levying of the tax in Lee, therefore, void? Are city charters, under which taxes are levied void, because all the people of the State are not subjected thereto? Are all special acts of the legislature forbidden by this section of the bill of rights? If

the solicitor's argument be true, the court must decide these questions affirmatively.

With equal seriousness, it is earnestly argued, that the law is in conflict with section nine, of the bill of rights, which secures the right of trial by jury.  It is said, that if this law be sustained, "under color of taxation," private property will be taken without trial by jury.  Now, this taking of "private property under color of taxation," by the effect of this law, or more properly as a consequence thereof, which seems so terrible to plaintiff's solicitor, is nothing more than the levying and collecting of taxes in the ordinary way.  It is gravely contended, that the right of trial by jury, interferes with the taxing power, as it is now exercised.  If the solicitor's position be correct, before any tax can be levied by the proper authorities, for the building of school houses, bridges, poor-houses, and to pay the ordinary expenses of the state and county, as well as for the building of railroads, a jury must intervene—a trial be had, and after verdict, the tax may only be levied. It would seem proper, and, in fact, obligatory upon the gentleman, as the discoverer of this principle of constitutional law, to enlighten the court and the country, by detailed directions as to the proper proceedings to be had, in order that these taxes may be sanctioned by the verdict of a jury; and in case he finds no proper directions to exist in the Code on the subject, he would, certainly, confer a favor upon the people, by submitting proper suggestions and directions for the consideration of the legislature, that a constitutional law may be passed on that subject.

Section 21 of the bill of rights, is next quoted by the solicitor for plaintiffs, and relied upon as invalidating the act of the legislature in question.  Here, the gentleman proves, indeed, that in addition to his capacity to delve into the profound depths of constitutional law, and bring to the gaze of admiring courts, new, and before unknown doctrines and principles of construction, he can be, in dealing with these grave constitutional questions, extremely funny.  The gentleman's argument, very slightly abrevi-

ated, and almost in his own words, is this : The section 21 of the bill of rights, and article 1, sec. 10, of the constitution of the United States, provide that the legislature shall pass no law impairing the obligation of contracts; the relation of sovereignty and subject, is an express contract—the government is the sovereign—the people, the subjects. In our State, it is not a parol, but a written contract, (a deed, I suppose he might have called it, since seals are abolished in Iowa,) and is embodied in the constitution. Now, " the government of Iowa contracted " in the constitution, " with us expressly, to protect us in the enjoyment of property;" this law " slips in and puts a man's property in jeopardy," and " taxes him :" therefore, the statute in question, " impairs the obligations of contracts," and is, consequently, unconstitutional and void.

I will submit to the gentleman that, according to his understanding and interpretation of the constitution and laws generally, while it may be doubtful whether he has made out a clear case against the " Government of Iowa," for " impairing the obligations of contracts," he may consider that he has, indeed, made a strong case for the violation of a contract by the said " Government of Iowa." According to his showing, the said "Government of Iowa" contracted with his clients, to protect them, &c., but has failed so to do, whereby they have suffered damage ; a clear cause of action. The gentleman, doubtless, among his other constitutional discoveries, will find a proper form of action against the aforesaid " Government of Iowa," and a proper court in which to bring it, whereby he may obtain redress for the grievances of his clients. The court ought to be thankful to the gentleman, for entertaining them in the discharge of the grave and onerous duties of the bench, with a constitutional disquisition so very amusing.

Section 24 of the bill of rights, is next quoted by the gentleman, and in it he sees absolute prohibition to the exercise of any powers by the legislature, except those expressly mentioned in, and conferred by the constitution.

Here, again, is another most important discovery in the science of constitutional law. If the gentleman's argument and position be true, our poor constitution is, indeed, a much abused and often violated instrument. Not one law has been passed by the legislature, that is not in conflict with it; nor, in fact, can the legislature pass laws on any subject. Article 3 of the constitution, defines the powers of the general assembly. In that article, and in fact, in the whole instrument, express power to legislate on any particular subject, is not given. The legislature is prohibited from passing laws on several subjects, but no express permission is given to legislate on any specified subject. If the gentleman's construction of this question be true, every law now on our statute book, is unconstitutional.

I have, heretofore, noticed pretty fully, the power of the legislature. I will but call attention to article 3, sec. 1 of the constitution, which provides that the legislative authority of this State, shall be vested in the general assembly. The legislative authority, conferred on the general assembly, is only limited by the restrictions in the constitution; this branch of government, is the supreme power in the State, (1 Kent's Com., marg. p., 221), to which the people have confided power, not reserved in themselves. The legislature, therefore, has power to pass all laws not expressly forbidden by the constitution of the State, or of the United States.

The gentleman finds another constitutional objection in article 3, sec. 26, which, as all others relied on so confidently by him, is argued to be clearly and positively fatal to the validity of the law. Was ever a law so utterly void. Was ever a legislature so rebellious to the supreme will of the people prescribed in the constitution. Here is one little law, that violates seven distinct provisions of the fundamental and paramount law of the land. The legistature, in the exercise of what was humbly conceived to be an attribute of supreme legislative power, enacts this brief statute, when the solicitor for plaintiffs appears in all the ter-

rors of the avenger of an outraged people, and holding in his hand these seven constitutional objections—corresponding with the seven plagues, and the seven vials of wrath, mentioned in the Apocalypse—pours them all, in one exterminating torrent, on the head of the offending general assembly, and sweeps away forever, the rebellious work of its hands.

This section (article 3, sec. 26,) provides that " every law shall embrace but one object, which shall be expressed in the title." The solicitor does not pretend that this is applicable to the confirmatory act in question, but to the proceedings and vote of the people, in authorizing the subscription to the railroads. Now, this prohibition applies, evidently, to the acts of the legislature, and nothing else; and who ever heard an order, judgment, decree, or proceedings of the county court, or a vote of the people, called a law? The argument is simply absurd. In *McMillan et al.* v. *Boyles, Judge,* &c., 3 Iowa, 322, it is said the spirit of this provision applies to these proceedings of the county, but that it does not, in its letter, have any application to them; that the power exercised by the county, being a qualified kind of legislation, to be exercised strictly under direction of the statute; and that there being no provisions for connecting two questions in one submission, nor for the imposing of any condition, whereby a proposition adopted by a majority of votes, shall be defeated, the court argues, that under the strictness of construction, this qualified legislation must be held, in every single exercise thereof, to a proposition having one object. Section 119 of the Code provides, that a vote of the people upon propositions to borrow money, &c., and "the entry thereof on the county records, shall have the force and effect of a law of the general assembly." It will be remarked, that the vote and record is not, by this provision, brought within the restrictions imposed upon laws of the general assembly—they are only affected so far as their " force and effect" are concerned, and no farther. But

suppose by this section of the Code, they were brought within the constitutional restriction governing laws, it is but a legislative act that gives them such character, which can, as all other laws, be repealed and modified, or its operation suspended, at the will of the general assembly. The act legalizing the bonds of Lee county, by curing all defects arising from a non-compliance with law, is a simple exercise of the conceded power of the legislature to annul, repeal and suspend existing laws, and to alter, modify or abolish proceedings before any or all courts and authorities in the State. But this court, in *The State of Iowa, ex rel. Weir* v. *The County Judge of Davis County,* 2 Iowa, 281, held, that a law establishing forty-six roads, was not obnoxious to this clause of the constitution. It would seem, that if it be competent for the legislature, by one single law, to give legal existence to forty-six roads, it is also within the power of the county, if she is governed by the same constitutional restrictions, to give her aid by one *quasi* law, to the construction of three railroads.

It is objected to the law in question, that it is retrospective; and while the solicitor of plaintiffs does not entirely deny the right of the legislature to enact laws of that character, he argues, that the act in question, on account of its manifest injustice, is void. He says, "when they (retrospective statutes) conflict with any constitutional provision, or disturb vested rights, or are manifestly unjust, they must fall." We will not contend that retrospective statutes, or any other statutes that conflict with constitutional provisions, are valid. A statute, whatever be its other characteristics, if it is unconstitutional, is certainly void; that much of the gentleman's proposition is true. But he says, if a retrospective statute "disturbs vested rights, or is manifestly unjust, it must fall." I will beg to introduce a few authorities, of the very many upon my brief, which very explicitly and very pointedly announce an entirely different doctrine.

The supreme court of the United States, in *Baltimore and Susquehanna Railroad Company* v. *Nesbit,* 10 How-

ard, 401, says: "That there exists a general power in the state government to enact retrospective or retroactive laws, is a point too well settled to admit of question at this day. The only limit upon this power in the States, by the federal constitution, and, therefore, the only source of cognizance, or control with respect to that power existing in this court, is the provision that these retrospective laws shall not be such as are technically *ex post facto*, or such as impair the obligation of contracts." In *Watson et al.* v. *Mercer*, 8 Peters, 110, the same court says: "It is clear, that this court has no right to pronounce an act of the state legislature void, as contrary to the constitution of the United States, from the mere fact that it divests antecedent vested rights of property. The constitution of the United States does not prohibit the States from passing retrospective laws generally, but only *ex post facto* laws." The same doctrine is announced by the same court, in *Calder* v. *Bull*, 3 Dallas, 385; *Fletcher* v. *Peck*, 6 Cranch, 138; *Ogden* v. *Saunders*, 12 Wheaton, 266; *Satterlee* v. *Mathewson*, 2 Peters, 380, and *Charleston River Bridge* v. *Warren Bridge*, 11 Peters, 420. Retrospective laws, then, and those divesting vested rights, are not in conflict with the constitution of the United States; to this doctrine there is no exception against those statutes which are manifestly unjust. These authorities explicitly declare, that the States may pass such laws, providing, of course, the particular State constitutions do not prohibit them. Let us compare the provisions of the constitution of the United States with the constitution of Iowa, in force when the law in controversy was enacted. The constitution of the United States provides, article 1, section 10, "No State shall pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts." The constitution of Iowa, bill of rights, section 21, says: "No bill of attainder, *ex post facto* law, or law impairing the obligation of contracts, shall ever be passed." It will be observed that the provisions are identical. Now, if the constitution of the United States does not forbid laws divesting vested

rights, and retrospective laws—even those that are " manifestly unjust "—neither does the constitution of our State. In all the States, where retrospective laws are not expressly forbidden by the State constitutions, they are held to be valid.   In Maryland, it has been decided, in *Baugher* v. *Nelson*, 9 Gill, 300 :   " That the prohibition in the constitution, against the passing of *ex post facto* laws, recognizes the right of the legislature to pass retrospective laws.'   In Ohio, such laws are constitutional.   *Chestnut* v. *Shane*, 16 Ohio, 599.   So in Georgia.   *Searcy* v. *Stubbs*, 12 Ga., 437 ; and in Pennsylvania.   *Underwood* v. *Lilly*, 10 Serg. & Rawle, 97 ; *Tate et al.* v. *Stooltzfoots*, 16 Ib., 35 ; *Bleakney et al.* v. *Farmers and M. Bank*, 17 Ib., 64 ; *Hepburn* v. *Curts*, 7 Watts, 300.   See also *Raverty and Wife* v. *Fridge*, 3 McLean, 230.   It is quite unnecessary to quote any more of the numerous authorities from the different States, which I find upon my brief.   The foregoing are certainly sufficient to establish the point.   The power of their respective legislatures to pass retrospective laws, has been recognized in all of the state courts, except those where it is expressly prohibited by state constitutions.   So far as I have been able to investigate the question, such prohibition exists only in New Hampshire and Tennessee.   As an authority against the law in question, the solicitor for plaintiffs, quotes *Merrell* v. *Sherburn*, 1 N. H., 199.   The 23d article, of the bill of rights of that State, provides as follows :   " Retrospective laws are highly injurious, oppressive and unjust; no such laws, therefore, should be made, either for the decision of civil causes, or the punishment of offences."   So in Tennessee, retrospective laws are held by the courts to be void : 1 Yerg., 360 ; 5 Ib., 320.   But section 20 of the declaration of rights of that State provides—" That no retrospective law, or law impairing the obligation of contracts, shall be made."

It is claimed, that the act in question, overthrows and annuls the decisions of this court ; that it makes valid what this court has pronounced void, and therefore, conflicts

with, and disregards the judgment of this, the highest judicial tribunal of the State. It is apparent that this law, is not only not in conflict with the decision of the court, nor an attempt to annul it, but that it recognized such decision, after its rendition, as the law of the land; for that reason, was the law passed. The decision being the law of the state, governing the rights and liabilities of parties concerned, the general assembly conceived that policy, justice and wisdom, required the existence of a different rule, and in the exercise of the supreme legislative power, and acting within the limits of that power, as I humbly conceive I have shown in this argument, the law in question was passed. It would be assuming, indeed, unheard of power, for this court, and dangerous too, in the extreme, to claim that the law, as announced by this court is, like those of the Medes and Persians, irrepealable by the supreme legislative power.

It is said that this court having held, in *McMillan et al.* v. *Boyles, County Judge*, &c., that the vote, subscription, &c., of Lee county, were void, the legislature cannot make valid such void transactions. While I am warranted in presuming that the word *void*, as used by the court, in the opinion in that case, was a slip of the pen, and not intended to be understood in its legal acceptation, it is clear, upon principle, and from the authorities, that the legislature may make valid and binding, void contracts and transactions. See *Wilkinson* v. *Leland*, 2 Peters, 661; *Satterlee* v. *Mathewson*, 2 Peters, 412; *Watson* v. *Mercer*, 8 Peters, 108; *Cowgill* v. *Long*, 15 Ill., 203; *Menges* v. *Wertman*, 1 Penn. State R., 218. These authorities, with others upon my brief, are precisely in point, but the length this argument has already attained, admonishes me not to comment upon, or make extracts from them.

It is also claimed that the statute confirmatory of the proceedings in Lee county, is an encroachment upon the peculiar powers of this court, and instead of being a law, is a legislative sentence. Admitting this act of the legislature to be precisely what the gentleman terms it, " a leg-

islative sentence," it would still be valid, if the authorities referred to be relied upon as law. But it is not fair or honest in the affairs of life, to destroy the good reputation of a fellow-being, by giving him a bad name, unless he justly deserves it. Neither is it admissible for the solicitor of plaintiffs, to apply to the law in question a term of odium, and thereby seek to overthrow it. This law is not a "legislative sentence;" it is a statute confirming and curing defects in past transactions and acts, permitted by law to be done, but not performed in conformity with law. Such laws have been uniformly sustained by the courts. The authorities which I have quoted on this point, are not required to be sustained by others, to prove that this kind of legislation is constitutional.

The fact that the law was passed while a cause was pending in the courts of the State, upon the subject matter operated upon by it, does not affect its validity. The power of the legislature is not dependant upon any circumstance of that character. It was just as competent for the general assembly to legislate upon that subject, while an action was pending, as before its commencement, or after its determination.

It will be seen, that the law sustained in *Cowgill* v. *Long*, 15 Ill., 203, was passed during the pendency of an action which was defeated by it. So, in *Underwood* v. *Lilly*, 10 Serg. & Rawle, 97. *Taggart* v. *McGinn*, 14 Penn. State R., (2 Harris), 155, was an action of covenant for ground rent. Judgment was had upon a reference to arbitrators, and a rule granted to show cause why the award should not be set aside. Among other reasons filed on the rule, why the judgment should be set aside, was this one: The award was illegal, because there was no cause of action in covenant. The rule was discharged, December 28, 1849, and a writ of error filed, January 14, 1850. At the session of the legislature in 1850, an act was passed, providing "that in all cases now pending, or hereafter to be brought in courts of record of this commonwealth, to enforce the payment of ground rent due and

owing, the plaintiffs shall have a full and complete remedy thereof by action of covenant." The court affirmed the judgment in the case, and pronounced the law "a constitutional and beneficial statute." *Hepburn* v. *Curts*, 8 Watts, 300, is a case of precisely the same character. Suit was brought in assumpsit by one firm against another. Judgment for defendant, because Hepburn was a member of both firms. Plaintiff thereupon took out his writ of error. Before the decision of the case in the supreme court, and after the trial in the court below, the legislature passed a law providing that " no action now pending on writ of error or otherwise, or hereafter to be brought by partners against partners, shall abate, or be defeated by, reason of one or more individuals being, or having been, members of both firms," &c. The supreme court sustained the law as applicable to the case, and remanded it for trial. It cannot be shown on principle, that laws operating upon cases that are in litigation, are more obnoxious to constitutional restrictions and justice, than those laws which are applicable only to those cases which have not been adjudicated by the courts. In the cases above quoted, all of which are equally as strong as the case at bar, the courts held that the different statutes, which received their approbation, did not conflict with constitutional provisions, or, in the least degree, interfere with their power. Neither was it considered, that by any of these statutes, the legislatures attempted to exercise judicial power. And the legislatures have gone still farther, without being considered by the courts as assuming their peculiar judicial powers. The courts of many States have decided, that it is competent for the legislature, by law, to open final judgments, and permit defeated parties to have new trials. Such is the decision in *Braddee* v. *Brownfield*, 2 Watts & Serg., 271 ; and my recollection is, that like decisions have been made in Vermont, Maine, Connecticut, and probably Massachusetts. It will be remarked that the case at bar, was commenced after the passage of the confirmatory law in question.

In his discussion of the objection to the law, that it is an assumption by the general assembly of judicial power, the solicitor for plaintiffs remarks: "Courts are by far the most important branch of government. On their action depends the peace and repose of society, and the sacred rights of property." While I claim to vie with the gentleman in respect for the judiciary department of government, I must be permitted to suggest, that perhaps in this, as in many other cases, comparisons are highly invidious, and do not serve to elucidate the points in controversy. However, I presume, that as an *argumentum ad hominem*, it will have the weight with the court to which it is properly entitled.

It is undoubtedly a safe rule, and one which was adopted by this court, in *The State of Iowa, ex rel. Weir* v. *The County Judge of Davis County*, 2 Iowa, 280, viz: that the constant exercise of power by the general assemby, is conclusive evidence of its rightful possession by that body. See, also, *State* v. *Mayhew*, 2 Gill, 487. Now, since the adoption of the constitution, the legislature has, at every session, adopted laws differing in character, in no essential, from the confirmatory act in question. Laws have been passed legalizing the acts of justices of the peace, county commissioners, probate judges, notaries public, and other officers—confirming and making valid elections, acts of persons and corporations, assessments and taxes levied by counties and school districts, &c., &c. These acts have not been rare—they are found in every volume of the session laws, and the power of the legislature to enact them, has never been doubted. Rights have accrued under them, and no doubt large interests are preserved or affected by them, but it has never been discovered that they are unconstitutional and void. It remained for the plaintiffs' solicitor, with his "seven constitutional objections," to sweep them from the statute books. The authority of the legislature to pass the law in question, flows from its inherent taxing power, which is essential to the existence of the State. This power is limit-

ed only by the constitution, and the wisdom of the general assembly, and is restricted neither as to the character, amount, nor object of the tax. It may raise revenue for the ordinary expenses of the State, for education, improvements, or any object not forbidden in the constitution. In *Charles River Bridge* v. *Warren Bridge*, 11 Peters, 577, Justice McLean says: "That a State may appropriate private property to public use, is universally admitted. This power is incident to sovereignty, and there are no restrictions to its exercise, except such as may be imposed by the sovereignty itself. It may tax at its discretion, and adapt its policy to the wants of its citizens, and use their means for the promotion of its objects under its own laws." This power may be exercised by the general assembly in special and local acts, whenever taxes are required to be raised for proper objects. And I know of no authority vested in the courts, to determine when, and to what extent it may be exercised. *Shaw* v. *Dennis*, 5 Gillman, 405, is a case in point. In 1847, the legislature passed an act to authorize the levying of a special tax upon the owners of property in Rockford precinct, for the purpose of maintaining a certain bridge which had been previously erected, and constituted defendants bridge commissioners, to carry out the provisions of the act; in enforcing the collection of the tax levied, the property of plaintiff was taken, for which he brought his action of trespass. Judgment was rendered in the circuit court against defendants. On appeal to the supreme court, it was held that the law under which the tax was levied, was a constitutional exercise of the legislative taxing power. The learned judge who delivered the opinion of the court, said : " It will hardly be denied that the legislature has the right to impose a local tax upon a town or city, a precinct or county, for some local improvement, as the erection of a bridge or the repair of a road. In doing this, to be sure, it cannot say that one man shall pay all, and the others none, or that one shall pay one dollar, and another ten, for the tax must be uni-

form, and upon the value of the property which each one has, so that the burthen presses alike upon the whole community." "But the legislature must necessarily have the right to say, how large that community thus subject to the tax shall be, whether a city or one of its wards, or a precinct, a county, or the whole State. If the legislature had the right to impose this tax to build a bridge, it would be equally lawful to purchase one, or to pay for one already constructed for the public accommodation." See *Thomas* v. *Leland*, 24 Wend., 65, which is much stronger than the case just quoted. There, the court held an act of the legislature to be constitutional and valid, which imposed a tax on the city of Utica to pay $38,615, for which certain citizens had given their bond, in order to secure the termination of a canal at that place. The contract of the citizens to secure the termination of the canal, as well as the act of the legislature, was without the consent or formal ratification of the people of the city. It may also be observed, that in the case of *Shaw* v. *Dennise*, the people taxed did not consent expressly to the law taxing them, nor were they parties to any contract binding them to pay for the bridge.

These cases, as well as many others that I have quoted, are very much stronger than the one at bar. The people of Lee county have consented to pay the tax which is forbidden by the injunction in this cause—nay, I may say, they now desire to pay it. The law in question, curing formal defects in the manner in which their consent and wishes were expressed, has made obligatory and binding the acts and proceedings, which the people honestly intended should be so from the first. It removed technical objections to their acts, done in good faith, for the express purpose of levying a tax on themselves. Will this court, disregarding the precedents cited, compel them not to do, what they desire, and are willing to do? The confirmatory law in question, being, as I humbly conceive, a legitimate exercise of the constitutional power of the general assembly, is eminently just and proper, in aiding the

people to carry out their solemnly expressed wishes. And what power in the State can stand between the people and their wishes? The general assembly, constituted of the immediate representatives of the people, is not more strongly bound by the genius of our free and democratic institutions, to obey the popular will, than is this court, when that will is expressed by legislative acts, in accordance with the constitution.

WOODWARD, J.—The question now made is, whether the legislature could, by the act of 1857, cure the evils existing in the former submission to, and vote by, the people of Lee county. The argument of the counsel of appellants, strikes at the fundamental, constitutional power of the legislature, to confer upon the counties the authority to subscribe to railway companies, and for similar internal improvements. We understand this question to have been settled, in the case of *Clapp* v. *The County of Cedar*, 5 Iowa, 15, in which the majority of the present court, felt themselves constrained to admit the power, upon the force of two previous judicial decisions, and several acts of legislation, in which it had been distinctly recognized.

The power having been conferred, then, can the general assembly cure any defects in the exercise of it? Upon this question, we cannot entertain a doubt. If this exercise of the authority were held to be unconstitutional—if the former decision of this court upon this case, had been based upon such grounds—then it would follow, that the legislature could not render the case valid. But, inasmuch as that body can confer the authority, and has conferred it, we conceive that the same body may remedy a defect in the exercise of it. Without taking the time to examine the cases, we refer to those cited in the argument of respondent. Neither does the pressing business of the court, permit a detailed notice of the arguments of petitioners, drawn from a supposed conflict with the constitution, although much might be said in relation thereto.

The wisdom of the legislation, here called in question,

it is not our province to comment upon, but only the capacity for its exercise. And we cannot doubt, but that the power which can confer an authority, and prescribe the manner of its use, may change the mode, or cure its defects. There are, undoubtedly, restrictions to the exercise of this power, but they are not brought into view, in the present case.

The judgment of the court below should be affirmed.