EDWARD N. DICKERSON, RESPONDENT, VS. JANE Y. ACOSTA, APPELLANT.

1. Under the Act of Congress of June 7, 1862, providing for the collection of direct taxes in insurrectionary districts, which provides that unless the taxes therein mentioned shall be paid within sixty days from the time of levying the same, the title to the property taxed shall "become forfeited" to the United States, there was no effectual forfeiture until a sale had been made pursuant to the act. The act was designed to be a measure of revenue.

2. The sixth section of Article XV of the Constitution of this State reads as follows: "All proceedings, decisions or actions accomplished by civil or military officers, acting under authority of the United States, subsequent to the 10th day of January, A. D. 1861, and prior to the final restoration of the State to the Government of the United States, are hereby declared valid, and shall not be subject to adjudication in the courts of this State." If this is construed as an act of legislation whereby the property of one is transferred to another without due process of law, it is void by the Constitution of the United States; construed as a judicial act, it is void for the want of power in the convention or the people to determine the rights of parties, unheard and without notice. The evident purpose of the convention in adopting this section was to prevent the courts of this State from entertaining suits brought to set aside, reverse or annul any act or decision of officers of the United States, acting within the scope of their authority, but it does not control the power of the courts to determine the legal effect of such acts and decisions as evidence affecting the rights of parties, according to the ordinary rules of law.

3. The seventh section of the Act of Congress of June 7th, 1862, providing for the collection of direct taxes in insurrectionary districts, declares that the certificate of sale for taxes "shall be received in all courts and places as *prima facie* evidence of the regularity and validity of the sale and of the title of the purchaser under the same;" and further, "that the certificate of the Commissioners shall only be affected as evidence of the regularity and validity of sale by establishing the fact that said property was not subject to taxes, or that the taxes had been paid previous to sale, or that the property had been redeemed according to the provisions of this act." *Held*, that the act should be so construed that the owner of lands sold for said taxes may show, for the purpose of defeating the certificate of sale, that no tax had been legally assessed, or that any other step necessary to be taken by the Commissioners had not been taken, and, thus, that they were without

power to make the sale; and that all their essential proceedings which were not conformable to law were of no legal force to affect the title to the property.

4. A tax levied by the Direct Tax Commissioners of the United States, in 1863, in Nassau county, while a small portion only of the county had been subject to the military authority of the United States, was not authorized by the Act of Congress. The Tax Commissioners were not empowered to enter upon the discharge of their duties until the commanding General of the forces of the United States had established the military authority of the United States *throughout* the county.

Appeal from the Circuit Court from Nassau county.

*D. L. Yulee* for Respondent.

*B. B. Andrews and B. M. Davis* for Appellant.

RANDALL, C. J., delivered the opinion of the court.

This is an appeal from the judgment of the Circuit Court for the county of Nassau, in an action for the recovery of a lot of land in Fernandina, brought under the code.

The answer admits that appellant was in possession at the time of the commencement of the action, and alleges that she has been in the peaceable possession, under an adverse title, for upwards of seven years prior thereto. The cause was tried before the Judge, without a jury, and judgment was rendered in favor of plaintiff, from which appellant took an appeal.

The plaintiff having shown the evidence of his title, the defendant, appellant, produced a certificate of sale by the United States Direct Tax Commissioners for the State of Florida, in January, 1865, under an act of Congress providing for the collection of direct taxes in the insurrectionary States.

The Judge held that the certificate, as shown by the evidence introduced by the plaintiff, was void for several causes stated by him in his findings.

It is insisted by counsel for appellant that the "court

erred in considering the title deeds and right of possession of the plaintiff in the land in question, anterior to the tax assessment and sale of the property by the United States Direct Tax Commissioners, in 1865, because prior to said assessment and sale the title to the lot in question had become *forfeited* to the United States, under section 4 of the Act of Congress, approved June 7, 1862."

Counsel refer to the opinion of this court in Billings vs. Stark, 15 Fla. 297. We discover nothing in the opinion of the court in that case to sustain the point here made. In that case the plaintiff claimed title by virtue of a tax certificate signed by a majority of the Board of Commissioners, and it was held that such certificate was *prima facie* evidence of title in the purchaser, and that the title was not overcome on the part of defendant by evidence of a former title and possession anterior to the tax sale. There was some testimony in that case tending to show certain irregularities in the assessment and sale; but it was not considered sufficient to impeach the certificate of sale, and upon this subject we said that " the defendant must defeat the plaintiff's case by showing that the assessment and sale were not made in conformity to law ; that the property was not subject to taxes, or that the taxes had been paid previous to sale, or that the property had been redeemed according to the provisions of the Act of Congress ; " and that " the testimony as to the non-concurrence of the third commissioner in the assessment, notice and sale, as given in the record, does not invalidate the proceedings." There was nothing in the decision in that case which precluded or denied the right to inquire into the question of the legality of the proceedings of the Tax Commissioners anterior to the sale for the non-payment of taxes.

Counsel also insist, in argument, that the act of Congress relating to the collection of direct taxes in insurrectionary districts, and the proceedings of the officers appointed to carry that act into effect, were not merely in their operation

and purpose measures of revenue, but were auxiliary to the belligerent operations of the government of the United States in suppressing rebellion and reducing rebellious citizens to obedience, &c. ; and that by the terms of the act, in case of the non-payment of the tax within sixty days after assessment, the title to the property taxed " became *forfeited* to the United States." (See Sections 2-3-4.) The Supreme Court of the United States, in Bennett vs. Hunter, 9 Wallace, 326, has construed the act in question to be an act to raise revenue, primarily, by collecting taxes upon lands, and incidentally, in some respects, to the suppression of rebellion ; but that there was no effectual forfeiture of title until after a sale, and the sale would be invalidated by redemption. There is nothing in the act which looks to the giving effect to the principle of the ancient law of forfeiture.

Again, it is insisted that the courts of this State cannot go behind the acts of the United States Tax Commissioners to inquire into their regularity or validity, by reason of the sixth Section of Article XV of the Constitution, which reads as follows :

" All proceedings, decisions, or actions accomplished by " civil or military officers acting under authority of the Uni- " ted States subsequent to the 10th day of January, A. D. " 1861, and prior to the final restoration of the State to the " government of the United States, are hereby declared valid " and shall not be subject to adjudication in the courts of this State," &c.

It is contended that this provision was intended to close the door to all inquiry into the legality of the acts of officers of the United States, civil or military, and that whatever was done by them within the scope of official action is legalized and must be accepted as valid.

If this constitutional provision is construed as an act of legislation, whereby the property of one is sought to be transferred to another otherwise than by due course of law, it is void by the Constitution of the United States. If the pro-

vision is construed to be a judicial determination of the rights of the parties, it is equally void for the want of power in the convention of the people who adopted it to determine the rights of parties who were not before the tribunal, and who had no notice of the contemplated adjudication. This general principle was sufficiently illustrated by this court in McNealy vs. Gregory, 13 Fla., 417.

But we apprehend that this clause of the Constitution is susceptible of a legitimate construction, and that it may be effectual to promote the end sought by the convention to be attained. As we understand it, the "proceedings, decisions or actions accomplished by the civil or military officers acting under the authority of the United States," which are "declared valid," are such acts and decisions as were authorized by the military power of the United States, or by the effective acts of Congress, notwithstanding any law of the State in contravention thereof, the intention being to recognize the civil and military authority of the United States during the period of the war as paramount ; and the provision that these acts and proceedings " shall not be subject to *adjudication* in the courts of this State," is a prohibition to such courts against taking cognizance of any suit or proceeding for the object and purpose of reversing or setting aside such acts and proceedings, as, for instance, the reversing or setting aside the judgment of a military court, or reversing or annulling any act of the Direct Tax Commissioners, or other officers, by a judgment or decree of the State courts directed against the proceeding itself.

This suit, however, was not brought for the purpose of setting aside or " adjudicating " any act or decision of the United States Tax Commissioners, but to recover possession of land. The defendant brings forward his tax certificate as evidence of his right of possession, and the question before the court was as to its admission as evidence, and the court decided to admit it. If the term " adjudicate," as used in the Constitution, means to decide upon its effect as evidence,

Dickerson v. Acosta.

then the court should, in obedience to the Constitution, have refused to receive or to reject it, a proposition which illustrates its own absurdity. If it be contended that the prohibition contained in the section of the Constitution referred to is intended to prevent an examination into the truth of the contents of the tax certificate, to ascertain whether, in fact, any tax was levied by authority of law; whether, in fact, any notice of the levying of the tax was given, or that the owners of property had an opportunity to pay it; whether, in fact, a sale was made in the manner required by law; whether, in fact, the entire paper is false and fraudulent, we must hold that we cannot sanction any such construction of the Constitution.

Appellant contends and assigns for error that the court erred in considering the testimony introduced by the plaintiff for the purpose of affecting the regularity and validity of the sale otherwise than to show that the property was not subject to taxes, or that the taxes had been paid, or that the property had been redeemed according to the provisions of the act of June 7, 1862.

The plaintiff was permitted to show certain facts and omissions which occurred prior to the sale, and the court considered such facts and decided thereon adversely to the defendant.

Section 7 of the act provides that the certificate of sale by the Direct Tax Commissioners "shall be received in all courts and places as *prima facie* evidence of the regularity and validity of the sale, and of the title of said purchaser under the same;" and further, the section concludes as follows: "*And provided further*, That the certificate of said commissioners shall only be affected as evidence of the regularity and validity of sale by establishing the fact that said property was not subject to taxes, or that the taxes had been paid previous to sale, or that the property had been redeemed according to the provisions of this act."

Very generally it has been held by the courts of various

States, and by the Supreme Court of the United States, under the various statutes relating to tax sales, that a deed given upon a sale for the non-payment of taxes was not sufficient evidence of title, but only of the fact of sale, and that proof of the regularity of the anterior proceedings devolves upon the person who claims title under the collector's sale. To divest an individual of his property against his consent, every substantial requisite of the law must be complied with, and no presumption can be raised in behalf of a collector who sells to cure any radical defect in his proceedings. (Ronkendorff vs. Taylor, 4 Peters S. C. 349; 4 Cranch, 403.) And every prerequisite to the exercise of the power must precede its exercise. (Thatcher vs. Powell, 6 Wheaton, 119; Williams vs. Peyton, 4 Wheaton, 77.)

In a case decided in 1868 by Mr. Justice Miller, arising out of a sale by the United States tax-commissioners for Arkansas, he says: "Nothing is better settled in the law of this country than that proceedings *in pais* for the purpose of divesting one person of title to real estate and conferring it on another, must be shown to have been in exact pursuance of the statute authorizing them, and that no presumption will be indulged in favor of their correctness." (Schenck vs. Peay & Bliss, 1 Woolworth's C. C. R. 175.)

The language of the 7th section of the act of June 7, 1862, however, appears to shift the burthen of proof of the regularity of the anterior proceedings upon the party who attacks the certificate of sale. Its language is, that the "certificate shall be received in all courts and places as *prima facie* evidence of the regularity and validity of the sale, and of *the title of the purchaser* under the same." There can be no constitutional objection to this change of the rule, because the right of the former owner to avoid the sale on account of the non-compliance of the officers with the legal requisites is preserved.

The appellant objects, however, that the last paragraph of the section precludes any inquiry beyond the question

Dickerson v. Acosta.

whether the property was subject to taxes, or that the taxes were paid, or that the property was redeemed after sale; and says that the title to the land is vested in him by means of the sale if the land was subject to be taxed and the taxes were not paid or the land not redeemed.

We cannot assent to a proposition so monstrous as this. It is not doubted that the government may sell property for taxes and make a good title to the purchaser. The very existence of the government depends upon this power, but in order to do this several things are essential. There must be a tax lawfully levied, an opportunity to pay it, a default and a sale, and these several matters must be conducted according to rules prescribed by the legislative authority or they cannot be exercised at all. The first thing to be regularly done is the levying of a tax authorized by law, which includes the listing, the valuation and the distribution or apportionment of the proper amount. If there has been no listing or valuation and no equal distribution of the tax, or if the tax upon the property of one-half the community is put designedly at an unequal proportion to that imposed upon the property of the other half, can there be no inquiry after a sale into the fraud and injustice of such proceedings? Is the auctioneer's hammer made more potent than constitutions and laws, and may the land of one man be transferred to another by force of an act of legislation which precludes inquiry? If such be the purpose of the act of Congress, we have no hesitation in declaring it of no force whatever.

The power of the tax-commissioners to sell lands for unpaid taxes depends upon the appropriate performance by them of the necessary preliminary steps, and if one be omitted the power is equally absent as though every thing had been omitted. And if no tax had ever been apportioned by them, and yet they had made a sale without notice and without an opportunity to pay or to prevent the

sale, the property would be transferred beyond recovery if this law, as insisted upon, could be enforced.

Now, what is the first condition requisite to the levying of this tax? By the 6th section it is enacted, "That the said board of tax-commissioners shall enter upon the discharge of the duties of their office whenever the commanding General of the forces of the United States, entering into any such insurrectionary State or district, shall have established the military authority of the United States throughout any parish or district or county of the same."

The testimony of the witnesses, Governor Reed, Dr. Harrison and Billings, establish the fact that in 1863, when the commissioners commenced their operations in Nassau county, and fixed the amount of this tax and gave the notice that it must be paid in sixty days from January 31, 1863, at their office in Fernandina, there was no assessment for Nassau county, but only for the town of Fernandina on Amelia Island; that only Amelia Island was occupied by Federal forces, the balance of the county or more than four-fifths of it being and remaining under the control of the Confederate military power. The military authority of the United States from the time of the passage of the act of Congress had not been established throughout the county at the time of the imposition of the tax. The terms "parish, county or district," were used in the act to designate the municipal subdivisions of the Southern or seceded States, as in Louisiana they are called parishes, in Florida and other States counties, and in South Carolina they were called parishes or districts. The only other territorial subdivisions of the States by the name of districts, were the collection districts of the United States.

The legitimate intention of the act, as we are enabled to understand, was, that wherever the military commander of the United States forces in Florida should establish the military authority of the United States throughout any county in this State, then the tax commissioners should enter upon

the discharge of their duties and proceed to levy and collect taxes; and that until such military authority was established throughout the country so that the citizens could freely pass for the purpose of paying taxes, transacting business and taking care of their property, the tax commissioners had no right or authority whatever to impose taxes.

The condition that the authority of the United States should be established by the commanding general throughout the county or district where taxes are to be levied, is essential to the power to exercise their duties by the tax commissioners. The condition not existing, the right to levy taxes does not exist, for the commissioners could enter upon the discharge of their duties when the commanding general should have rendered the performance of their duties possible throughout the county, and not before. The fundamental principles of equality and uniformity in the imposition of taxes could not be observed in this instance except by an assessment of all the taxable real estate in the county. It appears that the tax commissioners failed to find any assessment roll or list for the county or the city, and proceeded to make an assessment *de novo*. How, then, could an uniform tax be levied upon the property of the county to produce its proper ratio of tax without knowing, as a basis of the computation, the total amount of the taxable property to be assessed within the county? This dilemma would have been avoided by deferring the assessment and levying of the tax until the time appointed by the act. The proclamation of the commanding general, announcing that the authority of the United States had been established throughout a county or district, would have been an appropriate signal for the taxing officers to enter upon their duties. The absence of such announcement, and the fact, proven by members of the commission and by those who were in military command, that the town of Fernandina was the only place in the county where the Confederate military power was interrupted, leaves no room for doubt that the time for levying

the tax in any portion of the county had not arrived according to law, and that the tax levied, under the circumstances established by the record in this case, was levied without authority of law. The notice that the tax was fixed and must be paid within sixty days, was given, and the time expired before the authority of the United States was so established, and no new notice seems to have been given after such authority was established, without which no sale could afterwards be legally made.

This is all that is deemed necessary to be determined for the purpose of disposing of the present case. The further questions, whether levying fifty per cent. more of tax in one State than was authorized to be levied in another State upon a given valuation of property ; and whether onerous conditions could be imposed upon the owners of property in one State before they would be allowed to pay their taxes, which conditions were not imposed upon the people of other States ; and whether an additional sum could be imposed for costs, charges and expenses, without limit, except in the discretion of the commissioners and without express authority of law ; and whether the commissioners could lawfully sell lands for taxes upon a day not named in a notice of sale, or on a day to which the sale had not been adjourned ; these and other questions embraced in the assignment of errors are superseded by the conclusion we have reached, that the tax imposed upon the property in question was not authorized by law to be levied at the time it was levied, and that any subsequent sale therefor was, therefore, unauthorized and void, and carried no title to the purchaser. The certificate of sale, under the circumstances, is a nullity.

The judgment of the Circuit Court is affirmed.